CABOT
MANTANONA LLP
BankPacific Building, Second Floor
825 South Marine Corps Drive
Tamuning, Guam 96913
Telephone: (671) 646-2001
Facsimile: (671) 646-0777

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4
FACSIMILE: (671) 472-2601



FILED
DISTRICT COURT OF GUAM

NOV 26 2007

JEANNE G. QUINATA
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>vs.<br><br>RAYMOND IGNACIO DUENAS, JR. and<br>LOURDES CASTRO DUENAS<br><br>Defendant. | CRIMINAL CASE NO. 07-00039<br><br>DEFENDANTS' BRIEF<br>CONCERNING SUPPRESSION<br>OF PHYSICAL EVIDENCE |

## FACTS

On April 16, 2007, Guam Police Department officers working in conjunction with federal agents executed a search warrant on the private residential property of Mr. and Mrs. Raymond Duenas. During the execution of the warrant, the presence of several media representatives was noted on the property. While it is unclear whether the media were invited to the scene, it is undisputed that no action was taken to remove them from the scene during the warrant's execution. In fact, Officer Guzman testified that the Chief of Police, Paul Suba, greeted the media and took them on a tour of the search scene during the warrant's execution.

## PROCEDURAL HISTORY

This matter came before the Court on October 16, 2007. Defendants introduced two newspaper articles depicting media presence at the execution of the warrant at the Duenas residence. These articles contained photographs taken by the media showing various angles and depicting third-parties (non-police

officers) handling evidence. After a brief argument as to the applicability of the Supreme Court decision in *Wilson v. Layne*, 526 U.S. 603 (1999) and its progeny, the Court held that a *per se* Fourth Amendment violation occurred. The burden of proof then shifted to the government to prove under *Wilson* and its progeny that the evidence was untainted. The government then introduced the search warrant and rested.[1] Over Defendants' objections, the government reopened its case and introduced the testimony of several witnesses. The Court then expressly stated that the only matter left to be determined was the application of the exclusionary rule.

## MEMORANDUM OF POINTS AND AUTHORITIES

While the Government provides an interesting 12 page discourse on hornbook Fourth Amendment law, much of the argument therein seems out of place. Perhaps a clarification of the issue before the Court is appropriate in light of what could be a misunderstanding by the Government as to the relevant issue. For the record, Defendants have asserted that the *presence* of the media and other third parties for purposes other than to assist in the execution of the warrant at the Duenas residence constituted a *per se* violation of the Fourth Amendment. The Court has agreed and, in fact, this ruling is now the law of the case. All that remains to be determined is the application of the exclusionary rule, which is a separate issue from the question of whether a violation has occurred. *U.S. v. Hendrixson*, 234 F.3d 494, 495 (11th Cir. 2000).

### I. Various Points and Authorities Raised by the Government

Despite their irrelevance, Defendants would be remiss were they not to respond to the arguments contained in the government's brief as they contain many factual and legal misrepresentations. A point by point analysis follows:

> 1. *"Defendant's seek to suppress the seizure of all evidence, whether it will be used by the government or not. Hence, defendants are seeking an exception to the exclusionary rule, which generally is limited to evidence which is the fruit of an illegal search or seizure and which the government seeks to use against the victim of police misconduct."* (citation omitted). (Government's brief page 2 lines 1-4).

The quote above seems to be an admission by the government that it intends on distinguishing between evidence it will use and evidence it will not use. However, no official distinction has been made.

---

[1] The Government rested their case on two other occasions but was allowed, over Defendants' objections, to reopen their case as they woefully failed to satisfy their burden.

In response to the Court's attempt to make the distinction, the government was equivocal. The prosecutor stated that while she does not intend to introduce any physical evidence of stolen property, the use of photographs or argument referring to such evidence has not been ruled out.

> 2. *"As well, they seek an exception to the general rule that, even if officers exceed the scope of their warrant by seizing items which are outside the permissible search, evidence which was legally seized will not be suppressed."* (citation omitted). (Government's brief page 2 lines 4-7).

Despite this Court's ruling that a Fourth Amendment violation has occurred, the government persists in its argument that the evidence it intends on using, whatever evidence that may be, is somehow separate and distinct from the rest of the items illegally seized. No such distinction has been established. The government's primary evidence consisting of firearms, drugs and the contents of a locked safe confiscated at the Duenas' residence are as much "fruit of the poisonous tree" as is the rest of the property alleged to be stolen.

> 3. *"The courts balance the magnitude of the intrusion against the public and law enforcement interests the intrusion serves. This requires an analysis of the nature of the intrusion, which is alleged to be: 1) the photographing of seized property; 2) by representatives of the media 3) who were standing on defendants' front lawn; 4) taking photos of property which was otherwise lawfully seized before being placed on defendants' front lawn; and 5) the photos were taken by media representatives whom Guam police officers had allowed to walk onto and remain on the front yard."* (Government's brief page 2 lines 15-25).

In the first instance, the government has misstated Defendants' position. The intrusion complained of is:

1) the presence of media and other third parties;
2) whom were allowed to accompany Guam police officers at the Duenas' residence;
3) during the execution of the warrant at the Duenas' residence;
4) where the presence of the media was not in aid of the execution of the warrant; and
5) where the Affidavit presented to the Independent Magistrate, Judge Maraman, made no mention of any non-police presence.

This exact set of circumstances existed in *Wilson* and *Hendrixson*. The balance of competing interests has been analyzed by the highest court in our country and the determination has and continues to be that a Fourth Amendment violation has occurred. Defendants do not and have not argued that the taking of photographs has any bearing on the legality of the search, rather, that the *presence* of the media during the execution of the warrant is what is important. The photographs are simply "fruit of the poisonous tree".

4. *"Reporters and cameramen went to the scene without invitation from authorities."* (Government's brief page 3 line 17).

The above assertion by the government has not been established as fact. Officer Guzman, a government witness, stated he could not remember exactly when or whom he called on the day of the execution of the search warrant at the Duenas' property nor could he recall the substance of his conversations with media representatives. Officer Guzman testified that he did recall that the media were <u>invited</u> to an officer led tour of the premises and that he had asked the media to remain patient <u>at the scene</u> so that a sound byte could be provided. Officer Wade testified he was instructed to take media personnel to photograph and video tape marijuana plants, See also Exhibit G, the video tape showing marijuana plants.

5. *"The media were confined to the front yard of the residence, and never entered any of the enclosed structures which were searched..."* (Government's brief page 3 lines 20-21).

The testimony gathered at the hearing on the underlying motion revealed that the media were taken on a tour of the premises during the execution of the warrant. There was also evidence in the form of a video tape depicting the presence of media personnel outside the confines of the front yard of the Duenas residence. Further testimony revealed that no one officer or detail was responsible for the confinement of the media to the front yard of the residence. In fact, no one to date has been able to tell the Court where the media were at all times. Why? Because the police simply do not know where the media were at all times.

6. *"III. There is no expectation of privacy in one's front yard"* (Government's brief page 4 line 4).

The government provided a page long discussion supporting their above position. Why? The "open fields" doctrine is inapplicable and a discussion thereof is unwarranted. This Court should decline the government's invitation to examine a completely irrelevant line of cases. The instant case involved the search of a private residence not the search of an open field. The government believes that because the media were supposedly confined to the front yard of the Duenas' residence, no Fourth Amendment violation occurred. Supreme Court authority holds otherwise. In *Hanlon v. Berger*, 526 U.S. 808, 810 (1999)[2], the Supreme Court, relying on *Wilson*, held that the presence of a news crew during the search

---

[2] The Hanlon case was decided on the same day the Wilson decision was issued.

of a 75,000-acre ranch including appurtenant structures but *excluding* the residence pursuant to a warrant was a Fourth Amendment violation. Thus, the reasoning of *Wilson* and its progeny are not as limited as the government implies.

It is noteworthy that none of the government's cited cases involve the presence of the media, which is the essential thrust of Defendants' arguments. Further, all of the cases cited by the government concern the *warrantless* discovery of evidence *absent any entry into the home*. Clearly, the Court is faced with a different set of circumstances involving the presence of the media during a search conducted pursuant to a warrant on private residential property, where one's expectation of privacy is at its highest. *Wilson*, 528 U.S. at 610-612; *Hanlon v. Berger*, 526 U.S. at 810-811.

> 7. *"IV. The Fourth Amendment Regulates Government Conduct"* (Government's brief page 4 line 4).

Under the above heading the government argued that a private search conducted by the media does not implicate the Fourth Amendment. This argument is seemingly based on a mischaracterization of Defendants' motion. Defendants take issue with the <u>government's</u> search (not a private search) of their residence which exceeded the scope of the warrant because of the presence of the media during its execution. Here, the Guam Police Department allowed the media to be present during the search of the Duenas' residence. The Guam Police Department told the media to be patient on the scene so that a "sound byte" could be provided. The Guam Police Department invited the news media on a tour of the premises which included an excursion onto the dense grassy area surrounding the home (an area outside the scope of the warrant). In short, the Guam Police Department facilitated the news gathering mission of the media. To argue that no government action occurred is nonsensical.

The government argued that "the media were not acting as agents or instruments of the government." (Government's brief page 5 lines 3-4). Defendants agree and submit that this is exactly the reason why the Fourth Amendment is implicated. In *Wilson*, the Court found that that the reporters did not engage in the execution of the warrant, nor did they assist the police in their task. Despite this lack of media participation, the Court held that a Fourth Amendment violation occurred.

> 8. *"...defendants have the burden of proving that they had "a legitimate expectation of privacy" in the place which was searched and the property which was seized....They have none, however, in their front yard. There is no legitimate interest in the possession of contraband. Nor do people have any Fourth*

*Amendment interest in stolen property."* (citations omitted) (Government's brief page 6 lines 14-20).

The government's standing argument is threefold: 1) there is no expectation of privacy in one's front yard; 2) there is no legitimate interest in the possession of contraband and 3) there is no legitimate interest in stolen property.

Presumably, the government relies on the "open fields" doctrine as to its first argument. As stated above, the Supreme Court in *Hanlon* held that the presence of media during the search of one's <u>private property</u> pursuant to a warrant constitutes a Fourth Amendment violation. There is no question that the instant search occurred on defendants' private property. In further supplement to the *Hanlon* case, this Court should also note the irrelevance of the government's supporting cases, none of which addresses evidence seized from within a home and later placed in the front yard of a defendant. In contrast, the government only cites cases wherein the evidence recovered was originally located in an open field. Even the government cannot assert with a straight face that the open fields doctrine allows the police to enter into one's home, place all their property in their front yard and then ask the Court to accept the search as a valid exception to the Fourth Amendment.

In support of its second argument, the government cites a single case for the proposition that there is no legitimate interest in the possession of contraband. *Illinois v. Caballes*, 543 U.S. 405 (2005). Once again the government's argument is premised on a mischaracterization of defendants' position. Defendants do not argue that the contraband seizure was the <u>cause</u> of the Fourth Amendment violation rather that said seizure was a <u>consequence</u> thereof. The case cited by the government has no relevance. The *Illinois* court, in deciding whether a dog sniff violated the Fourth Amendment reasoned, "[A]ny interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that <u>only</u> reveals the possession of contraband 'compromises no legitimate privacy interest.'" *Illinois*, 543 U.S. at 408. (emphasis added). Thus, the gravamen of the *Illinois* decision was not that the seizure of contraband automatically equates to Fourth Amendment immunity, but that a dog sniff is so limited a search that the fruit of said search is unprotected. The same cannot be said of the instant case wherein a private residence was searched.

The government's third argument carries the same deficiency. A blanket statement that there is no Fourth Amendment interest in stolen property equates to sloppy analysis. It does not follow that a

seizure of stolen property automatically equates to Fourth Amendment immunity. For example, in *Arizona v. Hicks*, 480 U.S. 321 (1987), the Supreme Court held that a Fourth Amendment violation occurred where police officers illegally obtained stereo equipment later determined to be stolen. The reasoning of that decision was that the police never lawfully possessed the evidence. The same is true here. Because the police exceeded the scope of their warrant while searching the Duenas' residence, they were never lawfully in possession of any evidence thereby recovered.

It is important to re-emphasize that defendants' legitimate expectation of privacy was in their home. The government acknowledges this expectation. What the government fails to realize is that it is exactly this interest that has been violated and while faced with an endless supply of distractions provided by the government, this Court should remain so focused. "If the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional; *Horton v. California*, 496 U.S. 128, 140 (1990).

9. *"VI. Photographing Personal Property is not a Fourth Amendment Violation"* (Government's brief page 6 lines 14-20).

Defendants never argued that the photographs taken by the media at the Duenas' residence constituted a Fourth Amendment violation. Defendants argued that the *presence* of the media during the execution of the warrant at the Duenas' residence exceeded the scope of the warrant thereby making the search unlawful.

10. *"The companion case decided the same day, Hanlon v. Berger, 526 U.S. 808 (1999), related to media which had been invited to attend the execution of a search warrant of defendant's curtilage (outbuildings), an area constitutionally protected as part of the home."* (Government's brief page 8 lines 3-5).

The *Hanlon* case is devoid of any reference to curtilage. Its holding does not rely on the reasoning that the government implies. In fact, the holding is expressly grounded in the same reasoning the Court used in *Wilson*. The holding of both Supreme Court cases was more properly articulated in *Wise v. City of Richfield*, 2005 WL 361492 at *3, "The United States Supreme Court has determined that the presence of a news crew during the execution of a warrant in a private residence (<u>**or residential property**</u>) violates the Fourth Amendment." (emphasis added). (citations omitted). Given the

government's previous argument, it seems inconsistent that it would now argue that a 75,000 acre ranch, the subject of the search in Hanlon, would not constitute open fields.

11. *"B. Media and the Seizure of One's Person"* (Government's brief page 8 lines 9).

Why the government saw fit to include this heading or the lengthy analysis that followed is beyond defendant's comprehension. The analysis contained in *Wilson* is more than adequate and more importantly is actually relevant to the instant case.

II. **Whether Officers Exceeded the Scope of Their Authority Under the Warrant Inviting the Media and Other Private Persons to the Search Scene**

The Defendants believe the court should review the case of *Bills v. Aseltine*, 958 F2d 697 (6th Cir. 1992), as the case is instructive. In *Bills*, Officer Aseltine was told by a confidential informant that a stolen Kabuto generator and General Motors parts were located at the Bills ranch. Officer Aseltine then gets a warrant to search the Bills ranch and seize the Kabuto generator.

The search warrant is then executed on August 20, 1987 at 8:15 p.m. Officer Asaltine invites a General Motors security guard to come to the search scene to identify the General Motors property. The General Motors security guard identifies the property and "tours" the search scene taking 231 photographs. During the search, a Yamaha generator was found. The officers properly secured a second warrant in order to seize the Yamaha generator. On August 21, 1987 a third warrant was obtained for the General Motors parts and property. As a result of the three (3) search warrants, *Bills* filed a Motion to Suppress the General Motors property removed on August 21, 1987 and the Livingston County Circuit Courts suppressed the evidence because the August 20, 1987 search was overly broad and tainted the evidence. The 6th Circuit, reviewing the actions stated, the security guard was present "not to aid the officers or their mission, but for his own purposes involving recovery of stolen property." *Bills*, 958 F2d at 701.

Defendants believe the same thing applies to the media. Officer Allan Guzman testified that Chief Suba took the media on a "tour" of the crime scene in order to photograph and video the crime scene. He further testifies that this tour "assisted the public in recovering their items". That tour, conducted by the Chief of Police, was outside the scope of the warrant and could never be considered an action assisting the officers in the execution of their warrant.

The 6th Circuit held that the General Motors security guard was not covered by the August 20, 1987 warrant and thus, his intrusion was separate and distinct from the police entry for purposes other than the execution of the warrant. "Therefore, the General Motors security guard inspection tour was not authorized by any legal process or any known legal doctrine." *Id.* at 703.

Therefore, the court should apply the exclusionary rule and suppress all evidence in this case as the actions of the media, their tour and photography of same is no different than the unauthorized inspection that the General Motors security guard engaged in.

Furthermore, if in fact the media and third-parties were there for some police purpose, then the scope of the warrant has clearly been violated as no mention of third-parties was ever contained in the Affidavit or Application for Search Warrant presented to Judge Maraman. See Government's Exhibit 1 and Defendant's Exhibit E.

### III. Application of the Exclusionary Rule

The test for the entry itself and all subsequent conduct is whether these are reasonable; as the Supreme Court said in *Michigan v. Summers*, 452 U.S. 692, 699-700 (1981), reasonableness is the ultimate standard embodied in the Fourth Amendment. Therefore, when looking at the totality of the circumstances, did the government act reasonably in this case?

The government makes much of the holding in *Hendrixson*, and rightly so as this appears to be the most relevant authority to date. The *Hendrixson* court relied on footnote 2 of the *Wilson* opinion which stated:

> "Even though such actions might violate the Fourth Amendment, if the police are lawfully present, the violation of the Fourth Amendment is the presence of the media and not the presence of the police in the home. We have no occasion here to decide whether the exclusionary rule would apply to any evidence discovered or developed by the media representatives." *Wilson*, 528 U.S. at Footnote 2.

The Hendrixson court read the above quote to mean that, "evidence obtained by the police when the media is just present is not subject to the exclusionary rule, while it may remain an open question about whether evidence obtained by the media is subject to the exclusionary rule." *Hendrixson*, 234 F.3d at 496.

While the *Hendrixson* court declined to apply the exclusionary rule, it clearly did so with reservation. That court expressly limited its decision to the Eleventh Circuit and even recognized that

footnote 2 of the *Wilson* opinion is open to alternative interpretations. One such interpretation, recognized by the *Hendrixson* court and embraced by defendants, is that "although the [*Wilson*] Court withheld judgment on whether the exclusionary rule applied to evidence found by private parties, the rule nonetheless must definitely apply to the evidence seized by the government entities responsible for the Fourth Amendment Violation." *Id.* at Footnote 3. The *Hendrixson* court declined to adopt a brightline rule recognizing that certain factual situations could be more egregious than what occurred in *Hendrixson*. Defendants' believe this is just such a situation. The search was, in Paul Suba's words, "almost chaotic". Not one officer or witness called by the government could tell the Court who was even in charge of the search warrant, the search scene, the control of the media personnel or any other aspect of warrant. This lack of control,[3] coupled with the *per se* violation of the Fourth Amendment. Additionally, the fact that the search exceeded the scope of the warrant must be taken into account. Officer Kim Santos testified that the conduct of the officers was in violation of Guam Police Department Policy. When the Court looks at the totality of the circumstances in this case, the Court must determine the exclusionary is the proper remedy because the government failed to act in a reasonable manner.

This Court should keep in mind the purpose of the exclusionary rule, "to compel respect for the constitutional guaranty in the only effectively available way-by removing the incentive to disregard it." *Elkins v. United States*, 364 U.S. 206, 217 (1960). To hold otherwise is to grant the right but in reality to withhold its privilege and enjoyment.

The police conduct in this case is particularly flagrant. It has been mentioned by some of the government's witnesses that this was the biggest bust in Guam history. Rather than conduct themselves accordingly, GPD used the media, at the expense of defendants Fourth Amendment rights, to publicize themselves as cowboys. While there are admittedly social costs to the application of the exclusionary rule, the Court should note that the purpose of the rule is to prevent, not repair. "Courts can protect the innocent against such invasions only indirectly and through the medium of excluding evidence obtained against those who frequently are guilty." *Brinegar v. United States*, 338 U.S. 160, 181 (1949). (dissenting opinion). Justice Scalia reiterated this very sentiment in 1987 stating "There is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy

---

[3] Defendants would like to point out that no two officers who testified could even agree as to the location or size of the search scene.

of us all." *Hicks*, 107 S.Ct. at 1155. The search against the Duenas' residence must be regarded as the search of the home of Everyman.

## CONCLUSION

Defendants respectfully request that all evidence illegally seized, be suppressed. In the alternative, defendants respectfully request that all evidence for which the government has not met its burden of proof with regard to their contamination by the media, be suppressed.

///
///
///
///

DATED: Tamuning, Guam, NOV. 26, 2007.

**CABOT MANTANONA, LLP**

_____
JOHN V. R. AGUON, ESQ.
Attorney for Defendant Lourdes Duenas

**TEKER TORRES & TEKER, P.C.**

_____
JOSEPH C. RAZZANO, ESQ.
Attorney for Defendant Raymond Ignacio Duenas

## CERTIFICATE OF SERVICE

I, WILLIAM CRUZ, hereby certify that a true and exact copy of the foregoing document was duly hand-delivered to the following on November ____, 2007:

Karon Johnson

Asssitant United States Attorney

Sirena Plaza

108 Hernan Cortez, Ste. 500

Hagatna, Guam 96910

DATED: 11/26/07

_____
WILLIAM CRUZ