DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RAYMOND INACIO DUENAS, JR., and LOURDES CASTRO DUENAS,<br><br>Defendants. | Criminal Case No. 07-00039<br><br>**ORDER RE MOTION TO SUPPRESS PHYSICAL EVIDENCE AND MOTION TO SUPPRESS STATEMENTS** |

The Motion for Discovery[1] and Motion to Suppress Evidence filed by Defendants, Ray and Lourdes Duenas and Motion to Suppress Statements filed by the Defendant Raymond Duenas, Jr. came before this court for an evidentiary hearing on October 16, 17, 18, 19 and 22, 2007. After hearing the testimony of witnesses and argument from counsel, the court took the Motion to Suppress Evidence and Motion to Suppress Statements under advisement. For the reasons discussed more fully herein, the court sets forth the bases for its decision **DENYING** the motions.

## I. FACTS

On April 18, 2007, Police Officer Frankie E. Smith submitted to Judge Katherine A. Maraman an affidavit for a warrant to search the Defendants' residence in Astumbo, Dededo, Guam for evidence of narcotic trafficking. In his affidavit, the officer averred a source of information ("informant") received methamphetamine from Lourdes Duenas during a "controlled meet." The informant advised the officer that a large number of stolen property was seen in makeshift storage

---

[1]This Motion was disposed of at the hearing and will not be discussed herein.

units and that stolen vehicles were on the premises. In addition, the informant stressed that various weapons were inside and easily accessible to anyone.

Based on the affidavit, the Judge Maraman issued a search warrant permitting Officer Frankie E. Smith and Guam peace officers to conduct a search of the Defendants' residence and premises. At approximately 5:40 a.m. on April 19, 2007, Guam Police Department officers executed the search warrant and began their search of the premises. At the time, the Defendants were asleep in their tent/bedroom[2] when the officers entered the residence.

Soon after the search began, the Guam Fire Department was called and arrived on the scene because the Defendant, Raymond Duenas' mother (who resided with the couple), Mrs. Catalina Duenas, was in need of treatment. While treating Mrs. Duenas, her son was also seen by the Guam Fire Department for his complaints of ankle and chest pain. As it turned out, the search turned into one of Guam's biggest "bust" of stolen items. Given the large number of stolen items on the premises and the need to inventory the items, the search continued well into the next day.[3] Additionally there was an increased need for police personnel to assist in the search. At times it was unclear as to which officer was in charge of the crime scene because of the number of individuals present.[4]

A couple of hours after the search began, several members of the media "showed up" at the scene and were allowed access to the premises. The media was instructed to remain together on the front side of the main structure beside a shipping container.[5] While there, the media was allowed

---

[2]Behind the main structure on the property, a concrete house, were makeshift rooms. One of them was used as the Defendants' bedroom. *See* Docket No. 46, Exhibit 1 ("Attachment B").

[3]Officer Frankie Smith testified that there were several thousands of items needing to be cataloged.

[4]The court notes that Guam Police Department's management of the crime scene was woefully inadequate. While there may have been many officers present, there is no excuse for there to have been no one officer clearly in charge.

[5]It seems highly unusual that during the course of conducting a search of the premises the Guam Police Department would so willingly entertain the presence of the media.

to take photographs of stolen property that was being taken from the residence and surrounding structures and placed in a staging area in the front yard.[6] The police were using the staging area to inventory the items. Some members of the media were also escorted by an Guam Police Department Officer Scott Wade to the back of the property where marijuana plants were being grown. However, there was no evidence that any member of the media was permitted to freely roam the entire property or in any way assisted in the search or touched any of the property.

In addition to the media various private business owners and a government agency were contacted and then allowed access to the scene during the search. Marianas Cable Vision, Mid Pac, Inc. and the Department of Public Works were allowed such access. In addition, a police officer and a Superior Court of Guam Judge who had been victims of burglaries were allowed to retrieve their stolen items from the scene.

Many of the stolen items were placed in view of the media who photographed the items. Firearms, drugs and contents from a locked safe were kept in the control and possession of the law enforcement officers. The officers who seized and inventoried these items testified that no civilians and no members of the media were present during the search, the seizure or the subsequent tagging of such property.

Special Agent Michelle Jong from the Drug Enforcement Administration ("DEA") testified that she arrived at the crime scene at approximately 6:00 a.m. She left at around 8:45 a.m. when she went to interview the Defendants, who had already been taken to the Tamuning precinct. As Mr. Duenas was brought into an interview room, DEA Special Agent Michelle Jong noticed that the Defendant was limping and asked if he was okay. The Defendant told her that his ankle and chest hurt. Paramedics were then called. While waiting for the paramedics, Special Agent Jong advised the Defendant of his *Miranda* warnings and said she wanted to discuss the drug trafficking activities. When asked if he would like to give a statement, the Defendant expressed ambivalence and stated

---

[6]The police set up a staging area in the front yard where many of the items believed to be stolen were placed on makeshift tables under a canopy.

1 that he had cooperated with law enforcement before, and it had not gone well. The medics arrived and the Defendant was taken to the hospital. While at the hospital the Defendant recognized Officer Smith, as they had both been employed with a former islandwide cable company as installers. The Defendant then attempted to speak with Officer Smith about the arrest. Officer Smith told him not to make any statements until the medical procedures were completed. The Defendant was taken back to the Tamuning precinct at about 3:15 p.m. by other officers.

When the Defendant returned to the precinct, Special Agent Jong and DEA Special Agent Than Churchin re-advised the Defendant of his *Miranda* rights and advised him that they had found firearms at his residence. Special Agent Jong explained that he had options under the federal system. He could choose to cooperate and attempt to provide substantial assistance in hopes of a lighter sentence. If he chose that route, he could get an attorney right away. The Defendant informed Special Agent Jong that he wanted an attorney and the questioning stopped. Special Agent Jong called the Federal Public Defender. Meanwhile, Officer Smith arrived, and Special Agent Jong told Officer Smith that the Defendant had asked for an attorney.

Officer Smith then went into the room where the Defendant was seated and asked the Defendant "How you doing, Ray? Ok?" The Defendant stated that he would talk to Officer Smith, but that he did not want to talk to the "Feds" because they scared him. Special Agent Jong noticed they were speaking and asked them if they wanted her to be present; Defendant indicated that he did not want her there.

At that time, Officer Smith re-advised the Defendant of his rights and had the Defendant sign a waiver. *See* Docket No. 46, Exhibit 6 (Officer Smith's Summary); Exhibit 7 (Defendant's Waiver) and Exhibit 8 (Defendant's written statement).

Meanwhile, Defendant, Mrs. Lourdes Castro Duenas was taken into custody that same morning, and Agent Piolo read her *Miranda* rights at about 12:30 p.m. She agreed to make a statement and signed a waiver of her rights. *See* Docket No. 46, Exhibit 3. During the interview she admitted that she and her husband had been trafficking in ice for about a year, and had been

- 4 -

taking stolen goods in exchange for ice.  *See* Docket No. 46, Exhibit 4 (Agent Piolo's written report); Exhibit 5 (Mrs. Duenas' written statement).

## II. DISCUSSION

### A. MOTION FOR SUPPRESSION OF EVIDENCE BECAUSE THE SEARCH WAS EXECUTED IN AN UNREASONABLE MANNER.

Defendants argue that the evidence seized from the April 19, 2007 search should be suppressed because the manner in which the search warrant was executed renders the search unreasonable.  Accordingly, they request that all evidence obtained pursuant to the execution of the search warrant be suppressed.  The Fourth Amendment restrains the government from performing "unreasonable searches and seizures."  U.S. CONST. amend. IV.  The touchstone in evaluating the permissibility of any search is "reasonableness."  *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987).  In most cases, reasonableness requires a warrant and probable cause.  *Id.*

It is true that "the manner in which a warrant is executed is subject to later judicial review as to its reasonableness." *Dalia v. United States*, 441 U.S. 238, 258 (1979).  Unnecessary destruction of property or use of excessive force can render a search unreasonable.  *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir.2004).  Deciding whether officers' actions were reasonable requires a court to balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).

When considering this issue, the court can consider whether the search exceeded the scope of the warrant.  A search within the contemplation of a warrant weighs in favor of a conclusion of reasonableness.  *See United States v. Penn*, 647 F.2d 876, 882 n. 7 (9th Cir.1980) (en banc) ("A warranted search is unreasonable if it exceeds in scope or intensity the terms of the warrant.").  In this instance, pursuant to the warrant, the officers were authorized to search the house for drugs, guns, cash and associated documents and drug paraphernalia.  It appears they did just that.  *See*

- 5 -

*United States v. Becker*, 929 F.2d 442, 446 (9th Cir.1991) (holding that, where a warrant authorized a search of the defendant's premises, it was reasonable for officers to use a jackhammer to break up a concrete slab in the backyard in order to search for the evidence underneath).

### 1.    KNOCK AND ANNOUNCE RULE[7]

The Defendants argue that because there was no knock-and-announce prior to the search, the search was unreasonable. Generally, an officer authorized by warrant to enter a private dwelling must comply with the statutory "knock and announce" requirements of 18 U.S.C. § 3109. This statute provides:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C. § 3109 (1988). Additionally, the Supreme Court has recognized knock-and-announce as a component of the Fourth Amendment. *Wilson v. Arkansas,* 514 U.S. 927 (1995).

The Government argues that the officers announced their presence before entering the Defendants' tent. Even had they not, the Government contends suppression of the evidence would not necessarily be justified. The Supreme Court announced in *Hudson v. Michigan*, 126 S.Ct. 2159 (2006) that the exclusionary rule is not an appropriate remedy for violations of the knock-and-announce requirement. 126 S.Ct. at 2165. In *Hudson*, the police officers waited between three and five seconds before entering the defendant's unlocked door. The trial court granted the defendant's motion to suppress on the basis that the premature entry violated this Fourth Amendment rights. The Michigan Supreme Court reversed, and the Supreme Court affirmed.

The Court noted "[s]uppression of evidence . . . has always been our last resort, not our first impulse." *Id.* at 2163. It explained that application of the exclusionary rule to knock-and-announce violations would result in great costs, such as the release of dangerous criminals into society and the potential for a flood of no-knock claims by criminal defendants. *Id.* at 2165-66. It also noted

---

[7]This argument was briefed, it was not however, addressed at the evidentiary hearing. Nevertheless, the court will address the argument based upon the briefs.

- 6 -

availability of the exclusionary rule as a remedy to knock-and-announce violations might cause police officers to wait too long before executing a search, resulting in "preventable violence against officers in some cases, and the destruction of evidence in many others." *Id.* *Hudson* concluded application of the exclusionary rule to knock-and-announce violations would have little practical benefit. *Id.* at 2165-67. Moreover, it observed victims of knock-and-announce violations have an adequate remedy in civil litigation, such as suits under 42 U.S.C. § 1983. *Id.* at 2166-68. In sum, the Court concluded the costs of applying the exclusionary rule to knock-and-announce violations greatly outweigh the benefits, and held knock-and-announce violations cannot justify suppression of evidence under the exclusionary rule. *Id.* at 2167-68.

Because *Hudson*[8] precludes application of the exclusionary rule to knock-and-announce violations, the motion on this basis is **DENIED**.

### 2. EXECUTION OF THE SEARCH WARRANT

Defendants' second ground for suppression is that the police violated the requirements of Fed. R. Crim. P. 41 of the Federal Rules of Criminal Procedure and applicable Ninth Circuit caselaw in failing to provide Defendants a complete copy of the search warrant at the outset of the search of the residence. In this case, Defendants assert that they were not served the warrant at the time the agents entered their room. Additionally, Defendants contend that they were never presented with the affidavit which is required by Ninth Circuit caselaw, specifically *United States v. Gantt*, 194 F.3d 987, 991 (9th Cir. 1999) and *United States v. McGrew*, 122 F.3d 847, 850 (9th Cir. 1997).

Rule 41(f)(1)(C) provides in pertinent part: that the officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the

---

[8]There is no requirement that the police obtain a no-knock warrant simply because one is available. *See Richards v. Wisconsin*, 520 U.S. 385, 396 n. 7 (1997) (commenting that the fact that a no-knock entry has not been authorized in advance "should not be interpreted to remove the officers' authority to exercise independent judgment concerning the wisdom of a no-knock entry at the time the warrant is being executed"). The Supreme Court did not make any such limitations in its order and made it clear that, because the knock-and-announce rule protects interests that "have nothing to do with the seizure of . . . evidence, the exclusionary rule is inapplicable" to knock-and-announce violations. *Hudson*, 126 S.Ct. at 2165.

- 7 -

warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken. Fed. R. Crim. P. 41(f)(1)(C). The Ninth Circuit has held that "[a]bsent exigent circumstances, Rule 41(d) requires service of the warrant at the outset of the search on persons present at the search of their premises." *Gantt*, 194 F.3d at 1001. This is necessary since the basic function of a search warrant is to assure the subject of the search that his privacy is invaded only under legal warrant and to notify him of the extent of the officer's authority. *Id.*

The facts of *Gantt* can be briefly summarized as follows: the FBI executed a search warrant on Gantt's hotel room. The search warrant did not specify the suspected criminal activity, and rather than describing the items to be seized, the warrant stated, "See Attachment A." Attachment A was a two-page typed list of items to be seized. Upon entering the hotel room, the agents did not present Gantt with a copy of the warrant. Instead, they directed her to sit in the hallway while they conducted a three-hour search. The agents did not show Gantt the warrant until she asked to see it. The agents responded by showing her the face of the warrant but not Attachment A. After concluding their search, the agents gave Gantt an inventory of items seized and left a copy of the warrant with Attachment A behind in the hotel room. The agents arrested Gantt and took her to the FBI office where Gantt was given the entire warrant including Attachment A for the first time. The Ninth Circuit held that the agent's unjustified failure to give Gantt, who was present during the search, a complete copy of the search warrant as the search began or even after she asked to see it justified suppression of the evidence. The Ninth Circuit did, however, recognize that "[i]f agents fear the subject of a search might be violent or troublesome, they have ample authority to remove that person from the scene of the search." *Id.* at 1002-03.

In this case the Government contends that it is local police procedure to photograph a defendant holding the warrant to eliminate any doubt that he has received it. In this instance, Officer Smith gave Defendant, Mr. Duenas, a copy of the entire set of documents, the Warrant, Attachment A listing the items to be searched for, and the Affidavit. *See* Docket No. 46, Exhibit 2 (photograph showing the Defendant in receipt of documents). The Government contends that the documents

- 8 -

Case 1:07-cr-00039    Document 90    Filed 12/21/2007    Page 8 of 16

were left behind at the residence when he was taken into custody.

Here, the search warrant contained a general description of the types of items sought, and specifically referenced an attachment ("Attachment A") listing a number of more specific items. The Government has stated that the warrant, affidavit and attachment were provided to the Defendant at the time of the search. In light of the photograph, it certainly appears that the Defendant received a copy of the search warrant and Attachment A. Accordingly, the motion is **DENIED** on this basis.

### 3. THE PRESENCE OF THE MEDIA AND THIRD PERSONS WAS A VIOLATION.

The Defendants claim that the mere presence of third parties, and the media was a violation of the Fourth Amendment and *per se* made the search unreasonable. *See Wilson v. Layne*, 526 U.S. 603 (1999) ("We hold that it is a violation of the Fourth Amendment for the police to bring members of the media or other third parties into a home during the execution of a warrant when the presence of the third parties in the home was not in aid of the execution of the warrant."). In *Wilson*, the homeowners sued federal law enforcement officers under *Bivens*[9] and state law enforcement officers under § 1983.[10] The Court concluded that officers who took members of the media into a homeowner's home to observe and to record the execution of an arrest warrant did so in clear violation of the Fourth Amendment. Nevertheless, the Court concluded also that the officials who did so were entitled to qualified immunity.

The Court said that the appropriate question "is . . . whether a reasonable officer could have believed that bringing members of the media into a home during the execution of an arrest warrant was lawful . . . ." *Wilson*, 526 U.S. at 615. Concluding that at the time of the violation the law was "at best undeveloped," the Court said, "[g]iven such an undeveloped state of the law, the officers

---

[9] *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).

[10] Both *Bivens* and § 1983 actions allow a plaintiff to seek money damages from government officials who have violated a plaintiff's Fourth Amendment rights.

- 9 -

in this case cannot have been 'expected to predict the future course of constitutional law.' " *Id.* at 617. Here, both members of the media and third parties were clearly present at the scene.[11] To the extent that there were those individuals present to reclaim their property, the Supreme Court has long held that "the presence of third parties for the purpose of identifying the stolen property has long been approved by this Court and our common-law tradition." *Id.* at 611-612. However, with respect to the media, the court must consider whether a violation of the Defendants' Fourth Amendment rights occurred.

The Government argues that because the media was stationed to the side of the house in the front yard there simply is no Fourth Amendment right violation in this instance. While there is no question that Defendants have an expectation of privacy in their residence and areas within its curtilage, there is no such expectation as to the front yard. *United States v. Jenkins*, 426 F.Supp.2d 336 (E.D. N.C. 2006).

In determining the extent of a home's curtilage, the Supreme Court, in *United States v. Dunn,* 480 U.S. 294, 301 (1987), identified four factors that courts should consider in addressing the question: (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by passersby. *Id.* at 301. These factors do not yield a definite answer; rather they guide courts in determining whether the area is "so intimately connected to the home that it should fall under the umbrella of the Fourth Amendment's protections." *Id.*

As noted, while the search was being conducted, members of the media were stationed in the front yard on the side of the main residence. Based upon the testimony at the hearing, the court can

---

[11]The court finds it troubling that at the beginning of the evidentiary hearing the Government attorney assured the court that she would be able to prove that members of the media were not present during the search. Shortly after the hearing began, it became clear that counsel was wrong. In fact, the evidence showed that several members of the media were present during the search. Counsel is strongly advised that for future hearings she should expend the time to familiarize herself with her case before she makes such assurances.

- 10 -

infer that the media was stationed in close proximity to the home thereby satisfying the first *Dunn* factor. However, as to the second factor, there was no evidence or testimony offered to indicate that there was an enclosure surrounding the residence. In other words, there was no fence surrounding the residence. As for the nature of the uses to which the area is put, no testimony was presented to show that the area was harboring the "intimate activities associated with domestic life and the privacies of the home." *See Id.* at 301-02. Thus, this *Dunn* factor weighs against Fourth Amendment protection. Lastly, there was no evidence that the Defendants took any steps to protect the area in question from the observation of passersby. In sum, each of the *Dunn* factors, except arguably the first factor, weighs against a finding that the location of where the media was present was within the curtilage.

However, there was testimony that Guam Police Officer Scott Wade escorted certain media members beyond the front yard. In those instances, where members of the media were escorted beyond the front yard, the question facing the court is whether the evidence should be suppressed on this basis. Moreover, the court is concerned that evidence seized from the residence was later placed on the front yard in a "staging area." In *United States v. Leon*, 468 U.S. 897 (1984), the Court wrote, "[w]hether the exclusionary sanction is appropriately imposed in a particular case, our decisions make clear, is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *Id.* at 906.

The Court in *Wilson* said "[w]e have no occasion here to decide whether the exclusionary rule would apply to any evidence discovered or developed by the media representatives." *Wilson*, 526 U.S. at 614 n.2. The Court was careful to point out that the violation of the Fourth Amendment was the presence of the media in the home, not the presence of the police. *Id.* This footnote suggests that evidence obtained by the police when the media is just present is not subject to the exclusionary rule, while it may remain an open question about whether evidence obtained by the media is subject to the exclusionary rule.

As mentioned, members of the media were present as the search of Defendants' residence

- 11 -

was in progress. There is no indication that the presence of the media somehow expanded the scope of the search (the search was actually carried out by the police themselves) beyond that allowed by the terms of the warrant. Nor is there any allegation that the members of the media aided the search, touched, moved, or handled anything in the residence. The court has found no caselaw where the remedy to such a Fourth Amendment violation is exclusion of the evidence. "Each time the exclusionary rule is applied it exacts a substantial social cost for the vindication of Fourth Amendment rights. Relevant and reliable evidence is kept from the trier of fact and the search for truth at trial is deflected." *Rakas v. Illinois*, 439 U.S. 128, 140 (1978).

In *United States v. Henderixson*, 234 F.3d 494 (11th Cir. 2000), the defendant sought to suppress evidence obtained during the search of her residence because the police had allowed the news media to be involved. In light of *Wilson,* the court held that the presence of the reporter violated the defendant's Fourth Amendment rights. *Id.* at 496. However, the court went on to find that the reporter had not aided in the execution of the warrant, or expanded the scope of the search beyond that allowed by the terms of the warrant. The reporter arrived after the search was in progress and did not move, touch or handle anything in the residence. Accordingly, the court found that the police had conducted the search within the parameters of the warrant, and that the evidence obtained during the search was not subject to the exclusionary rule because the officers discovered the evidence, not the reporter.

Absent finding any caselaw suggesting otherwise, the court finds that rather than excluding evidence for a violation of the Defendants' Fourth Amendment rights, the better remedy may be found in civil litigation, such as suits under 42 U.S.C. § 1983 and *Bivens* actions against federal law enforcement. There was no evidence that a media member discovered or developed any evidence. It appears that the police conducted the search within the parameters of the warrant, and the evidence obtained during the search should not be subject to the exclusionary rule.[12] Accordingly,

---

[12] The Defendants also argue in their supplemental briefing that because of the Fourth Amendment violation, any of the evidence that was seized without the presence of the media (e.g. evidence consisting of firearms, drugs and contents of locked safe) should be excluded as "fruit of

- 12 -

the motion is **DENIED** on this basis.

### B. Motion for Suppression of Statements.

Defendant, Raymond Duenas Jr. claims that his statement was obtained in violation of his *Miranda* rights. The Defendant claims that he asked for a lawyer before he was questioned again by Officer Smith. Although he did sign a waiver card, he argued that this waiver was of no consequence.

The Government has the burden of proving that a defendant's statement is voluntary. *Lego v. Tworney,* 404 U.S. 477, 489 (1992). Whether a confession is deemed voluntary depends on the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973). The government's burden to show voluntariness cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *United States v. Perez-Lopez*, 348 F.3d 839, 846 (9th Cir. 2003) (citation omitted). "In evaluating voluntariness, the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Male Juvenile*, 280 F.3d 1008, 1022 (9th Cir. 2002) (citation omitted).

After the Defendant received medical treatment at the hospital, he was returned to the Tamuning precinct and placed in a large conference room. Special Agent Jong testified that she met with the Defendant and advised him of his *Miranda* rights. She advised the Defendant that guns and drugs were found at his residence and that the penalties were likely going to be enhanced. In response, he informed her that he wanted an attorney. He said he wanted to cooperate but wanted a lawyer first. She said she would see about getting a Federal Public Defender and the interview immediately terminated. Special Agent Jong left the room and informed Officer Smith of the Defendant's request for an attorney. Officer Smith then went into the room. Officer Smith asked

---

the poisonous tree." The court does not find this doctrine applicable. The court has already concluded that it will not exclude the evidence on the basis of the presence of the media. Likewise, it will not find any evidence not seized within the presence of the media subject to the exclusionary rule as "fruit of the poisonous tree."

- 13 -

the Defendant "how he was" and the Defendant stated that he would speak to him but would not speak to the "Feds." Officer Smith re-advised the Defendant of his *Miranda* rights and had the Defendant sign a waiver of his rights.

The court finds Special Agent Jong believable and that the Defendant did in fact, decline to talk to her and had asked for an attorney. The question here is whether, after the Defendant told Special Agent Jong that he wanted an attorney, the subsequent confession to Officer Smith was in violation of his Fourth Amendment rights.

The Government argues that the Defendant did not intend to invoke his right to counsel at all, at least as it concerns talking to Officer Smith. The Defendant knew Officer Smith since they had a friendship in the past. The Defendant attempted to speak to Officer Smith about the stolen property while they were at the hospital, shortly after he had already been read his *Miranda* warnings for the second time.

The law seems quite clear that once a defendant has asked for an attorney all further interrogation must cease. *See Edwards v. Arizona*, 451 U.S. 477, 484-86 (1981) (holding that once a defendant has asked for an attorney, he is not subject to further interrogation by the police until after counsel has been made available unless defendant initiates further communication, exchanges, or conversations with the authorities). However, when a defendant has initiated the dialogue, *Edwards* makes clear that the right to have a lawyer present can be waived. The court must decide whether, under the facts of this case, the Defendant may be said to have initiated communication with Officer Smith after having previously invoked his right to counsel. A defendant may change his mind and initiate communication; it is a factual question whether that has occurred. *United States v. Michaud*, 268 F.3d 728 (9th Cir. 2001).

As noted, Officer Smith asked the Defendant "how he was" which eventually led to the Defendant's voluntary confession. The court is not convinced that simply asking about the well-being of an old friend should be considered further interrogation especially after knowing the Defendant had just been treated at the hospital. There is no indication that the question was posed

- 14 -

in order to elicit statements about criminal activity. Rather, it was a reasonable question to ask the Defendant prior to transporting him to the Department of Corrections.[13] It was the Defendant who initiated conversation and indicated a desire to speak to Officer Smith. The Defendant again was given his *Miranda* rights for the third time of the day. Moreover, the Defendant, Mr. Duenas, is a 33-year-old man who has a prior felony conviction for Possession of a Controlled Substance with Intent to Deliver. *See* Docket No. 26. In short, he is a man who has knowledge of the criminal justice system. Therefore, when he signed the waiver form he was making a reasoned decision to talk to Officer Smith. Under the totality of the circumstances, it seems clear that the Defendant's statements were freely and voluntarily given, and that he made a knowing waiver of his right to counsel.

### III. CONCLUSION

Based upon the foregoing, the court finds *Hudson* precludes the application of the exclusionary rule for a "knock-and-announce" violation. Additionally, the court finds that the search warrant was properly executed. The court finds that the presence of the media was a violation of the Defendants' Fourth Amendment Rights and that the media should not have been permitted at the residence beyond the front yard. However, the court finds the appropriate remedy for such a violation is not the suppression of the evidence.[14] Although civilians were present at the scene the court finds that they were there to identify their property. Thus, there was no violation of the Defendants' Fourth Amendment rights. Accordingly the Motion to Suppress is **DENIED**.

Lastly, the court **DENIES** the Motion to Suppress Statements by the Defendant, Raymond Duenas. Under the totality of the circumstances, the court finds the statements were freely and voluntarily given and that the Defendant did knowingly waive his right to counsel.

---

[13]The court suspects that any seemingly innocuous statement made to the Defendant would have resulted in the Defendant speaking to Officer Smith. Had Officer Smith told the Defendant that it was time to be transported, the Defendant would have likely responded in the same way as he did on that day and initiated a conversation as to his alleged criminal conduct.

[14]Again a *Bivens* and § 1983 action may be the more appropriate remedy.

1    In light of this court's order, trial in this matter is hereby scheduled for January 15, 2008 at
2    9:30 a.m. All trial documents are to be filed no later than January 2, 2008. A final pretrial
3    conference is scheduled for January 8, 2008 at 9:30 a.m. In addition, the hearing scheduled for
4    December 19, 2007 is hereby vacated.

**IT IS SO ORDERED.**



/s/ Frances M. Tydingco-Gatewood
　　Chief Judge
**Dated: Dec 21, 2007**